# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-517

**EUNICE M. GUIDRY**

**VERSUS**

**ALLSTATE INSURANCE COMPANY, ET AL.**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, DOCKET NO. C-2008-0652
HONORABLE HERMAN C. CLAUSE, PRESIDING
**\*\*\*\*\*\*\*\*\*\***

## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, James T. Genovese, and Phyllis M. Keaty, Judges.

**AFFIRMED, AS AMENDED**.

**Nicholas A. Blanda**
**Anderson & Dozier**
**P.O. Box 82008**
**Lafayette, LA 70598-2008**
**(337) 233-3366**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Eunice M. Guidry**

**John W. Penny, Jr.**
**Penny & Hardy, APLC**
**600 Jefferson Street, Suite 601**
**Lafayette, LA 70502**
**(337) 231-1955**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Allstate Insurance Company, et al.**

**Staci Knox Villemarette**
**Cloyd, Wimberly & Villemarette, LLC**
**302 La Rue France, Suite 204**
**P.O. Box 53951**
**Lafayette, LA 70505-3951**
**(337) 289-6906**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **State Farm Mutual Automobile Insurance Company**

**COOKS, Judge.**

On March 11, 2007, Zakary Treadway (a minor) was driving his 1999 Ford Ranger pick-up truck in a southerly direction on Verot School Road in Lafayette Parish, when he struck the rear of a 1995 Lincoln Town Car driven by Eunice Guidry. Ms. Guidry had come to a stop behind a vehicle in front of her, when she was struck from the rear by the pick-up truck.

The Ford Ranger pick-up truck, driven by Zakary Treadway, was owned by his father, Travis Treadway, and insured by Allstate Insurance Company, with a liability policy limit of $250,000.00. Ms. Guidry's vehicle was insured by State Farm Mutual Automobile Insurance Company, with uninsured/underinsured motorist coverage (UM) limits of $100,000.00.

The parties' description of the severity of the accident was conflicting. Ms. Guidry argued the Treadway vehicle was "out of control," was traveling at an excessive rate of speed, and struck her vehicle at a high rate of speed, causing it to travel five to ten feet and strike the vehicle in front of her. Ms. Guidry maintained her vehicle was rendered a total loss due to the collision. Counsel for the Treadways and Allstate contended Zakary Treadway "braked" before impact, and the collision was "low speed." They asserted the accident caused only "minor damage" to the rear of Ms. Guidry's vehicle. An eyewitness to the accident stated Treadway passed his vehicle while traveling "well over the speed limit" and slammed his brakes once he saw Ms. Guidry's vehicle. The eyewitness stated the Treadway vehicle skidded for a second, and then struck Ms. Guidry's vehicle, pushing it into the vehicle in front of her.

Ms. Guidry was transported from the accident scene by ambulance to the emergency room at Our Lady of Lourdes Hospital in Lafayette. She complained of pain in her neck, lower back, and upper back/shoulder areas. She was discharged from the hospital that day with a diagnosis of cervical and lumber strains.

1

Ms. Guidry received follow-up care from Dr. Louis Blanda, an orthopaedic surgeon, who approximately two years earlier had performed a lumbar fusion on her in 2005 as a result of a prior automobile accident that occurred in 2004. Dr. Blanda testified that Ms. Guidry suffered a minor neck sprain in the 2004 accident, which had fully healed. Dr. Blanda believed the accident in question caused her neck problems and also caused a major aggravation to the lumbar problems caused by the 2004 accident. He also believed cervical surgery was a distinct possibility for Ms. Guidry to alleviate her neck problems.

Ms. Guidry was also treated by Dr. Daniel Hodges, a pain management specialist. Eventually, in preparation for trial, Defendants had Ms. Guidry examined by Dr. Thomas Bertuccini, a neurosurgeon.

Ms. Guidry filed suit seeking damages for the injuries she sustained in the car accident. It was stipulated that Zakary Treadway was solely liable in causing the accident. Following a four-day jury trial, a motion for directed verdict was entered, finding that Ms. Guidry was injured in the accident. The trial court also issued another directed verdict awarding Ms. Guidry $21,425.00 in past medical expenses and ordering State Farm to pay these past medical expenses. The jury rendered the following damage awards to Ms. Guidry: $75,000.00 for her past, present and future physical pain and suffering; $10,000.00 for loss of enjoyment of life; and $10,000.00 for future medical expenses. The jury did not make an award to Ms. Guidry for mental anguish or disability. Ms. Guidry now appeals, asserting that the jury erred in only awarding her $10,000.00 in future medical expenses. She also asserts the jury abused its discretion in only awarding her $75,000.00 for past, present and future pain and suffering, and in failing to make any awards for mental anguish and disability. She also contends the $10,000.00 award for loss of enjoyment of life is inadequate. The Defendants maintain the awards rendered by the jury were supported by the evidence and testimony in the record.

2

# ANALYSIS

## I. *Standard of Review*

The Louisiana Supreme Court in *Guillory v. Lee*, 09-75, p. 10-11 (La. 6/26/09), 16 So.3d 1104, 1116-17, set forth the standard for appellate review of damage awards:

> It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. Louisiana Civil Code article 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. *Wainwright v. Fontenot*, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. This court has noted:
>
> > [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
>
> *Perkins v. Entergy Corp.*, 00-1372 (La.3/23/01), 782 So.2d 606, *reh'g denied*, 4/27/01 (quoting *Canter v. Koehring*, 283 So.2d 716, 724 (La.1973)) (*superseded by statute on other grounds*). Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. *Youn v. Maritime Overseas Corp., et al.*, 623 So.2d 1257, 1261 (La.1993), *reh'g denied*, 10/7/93.
>
> The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. This court has long held true to the following principle:
>
> > [b]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of

3

> lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

*Wainwright*, 00-0492, p. 6, 774 So.2d at 74 (quoting *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted)). *See also Miller v. LAMMICO*, 07-1352, p. 28 (La.1/16/08), 973 So.2d 693, 711 (stating that an appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion and citing *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La.1993)); *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993); *Reck v. Stevens*, 373 So.2d 498, 501 (La.1979). Furthermore, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* (citing *Arceneaux v. Domingue*, 365 So. 2d 1330, 1333 (La.1978) and *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So.2d 967 (La.1985)). Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Perkins*, 782 So.2d at 612 (citing *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221). Reasonable persons frequently disagree about the measure of damages in a particular case. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn*, 623 So.2d at 1261.

## II. *Review of the Medical Evidence and Testimony*

This case turns on the jury's evaluation of the medical evidence and testimony in the record.

Ms. Guidry was taken from the scene of the accident to the emergency room complaining of neck and back pain. Thereafter, she received follow-up care from Dr. Blanda. At that time, Ms. Guidry was still under Dr. Blanda's active care with respect to a three-level lumbar fusion surgical procedure performed in October, 2005 as a result of injuries sustained in an April, 2004 automobile accident.

The MRIs revealed Ms. Guidry had a C5-6 disc herniation causing neural compression on her right side, a C6-7 central disc herniation and an L4-5 disc

4

herniation. Dr. Blanda believed the two cervical disc herniations were caused by the 2007 automobile accident, as he noted Ms. Guidry had ceased having any neck complaints by July, 2004. He also stated the 2007 accident either caused the L4-5 disc herniation, or made it symptomatic. Dr. Blanda stated, as of December 12, 2006, (three months before the subject accident) Ms. Guidry was doing well and her back pain had been alleviated. He testified that he was very near releasing Ms. Guidry from his care when the subject accident occurred.

Rather than perform surgery, Dr. Blanda recommended continuing physical therapy. According to Ms. Guidry, the repeated physical therapy sessions provided only short-term relief. Eventually, Dr. Blanda recommended Ms. Guidry undergo surgery to alleviate her neck and back pain. He believed without surgery, Ms. Guidry would endure chronic pain the remainder of her life.

Regarding causation, Dr. Blanda testified as follows:

Q. In your professional opinion, Dr. Blanda, considering everything you know about Ms. Guidry, going back to 2004 as a long time patient, is it your professional opinion that her two (2) herniations reflected on the . . . June, 2007 MRI were more probable than not caused by the March, 2007 auto accident.

A. I think they were. I mean, she had no complaints with the back for a long, long time. And I felt that her initial problem was a muscle sprain, and it got better. Now, she was having trouble again and not getting better, and MRI showed some problems.

Q. Ms. Guidry has since developed problems in her right arm, correct?

A. Yes.

Q. Is it your professional opinion that Ms. Guidry's two (2) disc herniations in her neck are the anatomical source of her right arm problems, as well as chronic neck pain?

A. I think it is. And she, as you said, progressed to where she was having pain in the right arm, right shoulder, was having development of weakness and some reflex asymmetry in the right arm, all indicating that this was coming from the neck.

Q. Those types of physical findings would be consistent with a right-sided disc herniation?

A.    Yes.

Dr. Mark Stephan, a radiologist, performed the 2007 MRIs on Ms. Guidry. A large portion of his testimony concerned comparing the 2007 MRIs with the previous scans and MRIs performed on Ms. Guidry following her 2004 accident. He found the cervical MRI largely similar to the cervical CT scan performed in 2004. However, he noted there was a small herniation at C5-6, with right-sided nerve compression, which was not present on the previous CT scan. Dr. Stephan testified he was unable to determine whether or not the lumbar disc herniation at L4-5 was a new injury or "left over from the 2005 study." As to whether the cervical and lumbar disc herniations were pre-existing or caused by the 2007 accident, Dr. Stephan stated he would defer to the treating physician.

While Ms. Guidry was considering surgery, Dr. Blanda referred her to Dr. Daniel Hodges for pain management. On May 17, 2010, Dr. Hodges evaluated Ms. Guidry. He felt she had good range of motion in her neck, but was tender at the base of her skull, with tenderness extending into her upper back. He also detected several areas of muscle spasm in her neck, shoulders, and upper back. He felt neurologically she "appeared to be intact" and had "no real significant gross sensory deficits that could be appreciated." As to Ms. Guidry's lower back problems, Dr. Hodges determined she did have some discomfort arching her back, but found she was neurologically intact. He noted she had subjective complaints of pain radiating into her lower extremities.

Dr. Hodges prescribed Darvocet, a pain medication, and Skelaxin, a muscle relaxant for her. He also noted she was using Valium periodically to help with sleep. Dr. Hodges opined that surgery "could benefit her" and give her a "little bit better quality of life." He also felt she was suffering from a "mild degree of anxiety and depression."

6

Dr. Hodges also testified as to what medical treatments would be appropriate for Ms. Guidry to have in the future. He believed it was reasonable to expect Ms. Guidry would require a three to four medication regime (including an anti-inflammatory, pain medication, and an anti-anxiety medication) for the remainder of her life. He also believed follow-up x-rays every year for approximately a decade would be prudent, as well as MRIs every three to five years for the remainder of her life. He stated she would need to be treated by a pain specialist three or four times per year, along with periodic check-ups with an orthopedist. Dr. Hodges also believed physical therapy would be required, as would epidural steroid injections or facet injections once a year. He also believed Ms. Guidry "could maybe benefit from counseling, just dealing with depression and anxiety due to secondary pain complaints." Further, he testified Ms. Guidry was permanently and totally disabled from all employment and restricted her to nothing more than light recreational activities. Dr. Hodges related Ms. Guidry's neck and back problems to the 2007 accident. On cross-examination, Dr. Hodges acknowledged he did not examine Ms. Guidry's medical records prior to the subject accident.

Defendants requested that Dr. Bertuccini, a neurosurgeon, examine Ms. Guidry. Dr. Bertuccini examined Ms. Guidry and reviewed all the medical scans and reports, both prior to and after the March 2007 accident. He found she suffered from "chronic post-traumatic pain and right upper extremity radiculitis; moderately severe by history along with mild sensory deficits." When questioned as to what specific trauma he was referring to when concluding Ms. Guidry suffered from "post-traumatic" pain, Dr. Bertuccini stated he was referring to post-March 2007 trauma. He believed Ms. Guidry suffered from a 5% total body impairment. Dr. Bertuccini also felt Ms. Guidry was not at maximum medical improvement and would require future medical treatment. He listed potential

treatment options to include physical therapy, epidural steroid injections, and the use of a dorsal column stimulator.

Dr. Bertuccini did not believe surgery was warranted for either her cervical or lumbar problems. He felt she had no spinal cord compression or significant compromise of any nerves in her cervical or lumbar spine to warrant surgery. Dr. Bertuccini stated he would require updated diagnostic testing before agreeing surgery was necessary or prudent.

## A. *Future Medical Expenses*

Ms. Guidry complains that the jury abused its discretion in only awarding her $10,000.00 in future medical expenses. As mentioned previously, after trial, directed verdicts were entered finding Ms. Guidry was injured in the accident and awarding her $21,425.00 in past medical expenses. We find the award of $10,000.00 in future medical expenses is abusively low when considering the testimony and documentary evidence concerning Ms. Guidry's future medical expenses.

A plaintiff has the burden of proving, by a preponderance of the evidence, entitlement to special damages such as future medical expenses. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31. In meeting this burden of proof, Ms. Guidry must show more probably than not, that these expenses will be incurred, and she must present medical testimony that they are indicated and the probable cost of these expenses. *Veazey v. State Farm Mut. Auto Ins.*, 587 So.2d 5 (La.App. 3 Cir.1991).

Ms. Guidry argues the evidence was uncontradicted that she was entitled to the cost of neck surgery, and substantially more than $10,000.00 in future non-surgical treatment. Ms. Guidry presented the testimony of Stephanie Chalfin, who was qualified as an expert in Life Care Planning. Ms. Chalfin set forth a detailed analysis of the specific costs of the accident related medical treatment

recommended by Dr. Blanda and Dr. Hodges, as well as the dorsal column stimulator mentioned by Dr. Bertuccini.

Ms. Chalfin found, based on Dr. Hodges' recommendations, Ms. Guidry would need to be on a multi-medicine regime for the remainder of her life. She examined the cost of the medicines Ms. Guidry was presently taking: Skelaxin, which cost $98 per month; Valium, which cost $10.94 per month; and Darvocet, which cost $24.98 per month.

Ms. Chalfin also determined Ms. Guidry would require four pain management sessions per year for the remainder of her life, at a cost of $155.00 per session. She also found Ms. Guidry would need one orthopedic evaluation once every year for ten years at a cost of $77.00 per visit.

The experts also testified Ms. Guidry will need one therapeutic evaluation each year for ten years at a cost of $90.00 to $92.00 per visit, ten physical therapy sessions per year for ten years at a cost of $125.00 per session, cervical and lumbar epidural steroid injections once per year for ten years at a cost per year of a $1,507.00 physician fee as well as a $3,843.98 facility fee. Ms. Chalfin also found eight to twelve counseling sessions in her lifetime may be needed, at a rate of $190.00 to $200.00 per session.

Ms. Guidry will also require annual or bi-annual lab and bloodwork studies at a cost between $105.00 (annual) to $210.00 (bi-annual) per year. Ms. Chalfin concluded Ms. Guidry would require one cervical x-ray ($74.00) and one lumbar x-ray ($95.00) every year for ten years, then one every other year for life. She also would need one cervical MRI ($1,260.00 to $1,593.00 per) and one lumbar MRI ($1,853.00 to $2,227.00 per) every three to four years for the remainder of her life.

Ms. Chalfin included in her life care plan, the cost of a dorsal column stimulator, which was referred to by Dr. Bertuccini as a possible treatment option. The total cost of this spine stimulator treatment was $212,794.00.

Ms. Guidry then presented the testimony of Randolph Rice, who was qualified as an expert in economics, to establish Ms. Guidry's life expectancy and the resulting present value of the costs of the recommended medical treatment. Mr. Rice set forth the following amounts for the non-surgical treatment recommended and contained within Ms. Chalfin's life care plan (excluding the dorsal column stimulator and the costs of any surgery):

| | |
|---|---|
| Future Medications | $ 27,143.00 |
| Medical Evaluations | $ 11,473.00 |
| Therapeutic Evaluation | $ 862.00 |
| Therapeutic Interventions | $ 31,271.00 |
| Diagnostic Testing and Lab Studies | $ 33,440.00 |
| Total | $104,189.00 |

*1. Future Medications*

In disputing the need for Ms. Guidry to receive an amount for future medications, Defendants argued that Ms. Guidry went a substantial period of time without refilling her prescription medicines. Thus, they argue it is reasonable for the jury to have refused to make such an award. We disagree. Ms. Guidry explained that her ex-husband had become addicted to certain prescription drugs, and she was concerned that would happen to her, so she began cutting back on how often she took her pills and attempted to use over the counter pain medicine if possible. This, she claimed, led to a stockpile of drugs that she continued to take when needed. She testified the pain eventually became so unbearable she was unable to function without the prescription medications. The record bears out she was actively taking her medication and refilling her prescriptions for months before trial. Both Dr. Hodges and Dr. Blanda believed the drugs were absolutely essential to Ms. Guidry being able to manage her pain. Dr. Bertuccini testified that it was reasonable for Ms. Guidry's treatment to include a prescription drug

10

regimen. Considering the testimony, and the fact that Ms. Chalfin and Mr. Rice's figures testimony as to the cost of the drugs was unchallenged, we find the trial court erred in not awarding Ms. Guidry $27,143.00 for future medications.

*2.  Medical Evaluations*

Ms. Chalfin testified Ms. Guidry will require four pain management sessions per year for the remainder of her life and one orthopedic evaluation once every year for ten years. Ms. Chalfin based her conclusions on Dr. Hodges' testimony. Mr. Rice calculated this would amount to $11,473.00. The defense did not present any testimony refuting the necessity of these visits or their cost, and Dr. Bertuccini agreed Ms. Guidry "deserves to remain under active medical treatment." Therefore, the jury abused its discretion in not awarding $11,473.00 in future medical evaluations.

*3.  Diagnostic Testing and Lab Studies*

Ms. Chalfin found, based on Dr. Hodges' testimony, that Ms. Guidry will require lab studies and several types of diagnostic testing over the remainder of her life. Mr. Rice calculated the costs for these services will be $33,440.00. There was no testimony from Dr. Bertuccini to dispute that these diagnostic tests and lab studies were necessary or that the costs and amounts for the testing were incorrect or excessive. In fact, Dr. Bertuccini agreed that Ms. Guidry "requires continued medical follow-up to determine if there are other treatments that might be beneficial for her." Therefore, the jury abused its discretion in not awarding $33,440.00 for the cost of future diagnostic testing and lab studies.

*4.  Therapeutic Interventions*

As set forth earlier, Ms. Chalfin's life care plan included yearly epidural steroid injections, physical therapy sessions, and counseling sessions. Ms. Guidry argues the jury erred in not awarding these costs.

11

Concerning the epidural steroid injections and physical therapy sessions, both Dr. Blanda and Dr. Hodges believed they were necessary for Ms. Guidry to effectively manage her chronic neck and back pain. Defendants argued Ms. Guidry, in the three years since the 2007 accident occurred until trial, had only received one epidural steroid injection. Defendants note that Ms. Guidry testified the injection provided only short-term relief from her pain. Similarly after attending dozens of physical therapy sessions after the 2007 accident, and receiving some short-term benefit, Ms. Guidry stopped going to the sessions.

As to the counseling sessions, Defendants point out that Ms. Guidry had not undergone any counseling sessions since the 2007 accident. They further point out that Dr. Hodges could only testify that counseling sessions "might help" and Dr. Bertuccini did not list counseling sessions as a reasonable treatment option.

Considering the record as a whole, we find the jury could have reasonably determined the therapeutic interventions and therapeutic evaluations were not necessary or the medical testimony was insufficient to establish such treatment would be required in the future. Therefore, we find the jury was within its discretion in not awarding any amount in future medical expenses for the therapeutic interventions and evaluations recommended in Ms. Chalfin's life care plan.

*5. Surgical Procedures*

Ms. Guidry asks this court to award an additional $79,000.00 in future medical expenses to reflect the cost of neck surgery. Ms. Guidry does not argue on appeal that she is entitled to the cost of future back surgery. We find the jury did not abuse its discretion in finding the necessity for neck surgery was not proven in this case. Although stating several times in his testimony that surgery was indicated for Ms. Guidry, on cross-examination Dr. Blanda acknowledged if a patient is neurologically intact, as Dr. Hodges concluded Ms. Guidry was, there is

12

"less" of an indication to perform surgery. After reviewing Dr. Blanda's testimony that in the three years since the accident in question, Ms. Guidry never agreed to undergo neck surgery, as well as Dr. Bertuccini's testimony that neck surgery was not warranted, we cannot say the jury abused its discretion in failing to make an award for the cost of future neck surgery.

### 6. *Dorsal Column Stimulator*

We also find the evidence did not establish that a dorsal column stimulator was a necessary treatment option for Ms. Guidry. Dr. Hodges, who was called by Ms. Guidry to testify as to the needed medical treatments, never mentioned a dorsal column stimulator. Dr. Blanda, at no point in his testimony, recommended the implant of that device. He stated that a dorsal column stimulator is generally employed *only after* back surgery has failed to achieve the desired results. Although Dr. Bertuccini did list a dorsal column stimulator as a "reasonable treatment option," he also stated it is only used as an "end-of-the-road strategy" and a "final consideration" if "everything else fails." Thus, the jury did not abuse its discretion in failing to award future medical expenses for implantation of a dorsal column stimulator.

### B. General Damages

Ms. Guidry also assigns as error the jury's awards for general damages, which were itemized as follows:

| | |
|---|---|
| Physical pain and suffering -- past, present and future: | $75,000.00 |
| Disability -- past, present and future: | $ 0.00 |
| Mental anguish, emotional and psychological damages -- past, present and future: | $ 0.00 |
| Loss of enjoyment of life -- past, present and future: | $10,000.00 |

13

Ms. Guidry argues these awards were abusively low considering the injuries she suffered as a result of the accident in question.

*1.    Physical Pain and Suffering*

Ms. Guidry contends the jury abused its discretion in awarding only $75,000.00 in past, present, and future physical pain and suffering. She asks that this court increase that award to $150,000.00. We note that since the jury's verdict form contained separate categories for mental anguish and disability, we must conclude the $75,000.00 amount awarded for pain and suffering was intended to solely encompass that specific area of damages and did not include any amount for mental anguish and disability.

The primary factors in assessing quantum for this category of general damages are the severity and the duration of the pain and suffering. *Jenkins v. State ex rel. Dep't of Transp. and Dev.*, 06-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, *writ denied*, 08-2471 (La.12/19/08), 996 So.2d 1133. Ms. Guidry notes that all the physicians who testified found she was in pain and that her condition would likely require continued medical treatment in the future. There was conflict among the doctors as to the severity of Ms. Guidry's pain and suffering and the jury was presented with evidence that Ms. Guidry had discontinued both her prescription medications and her physical therapy sessions in the time between the 2007 accident and trial. Therefore, considering the $75,000.00 award was reflective only of her pain and suffering, and not any mental anguish and disability, we cannot say the jury's award was abusively low.

*2.    Disability*

Ms. Guidry argues the jury abused its discretion in failing to make any award for disability. While disability is a component of general damages, more specifically it is recognized as those general damages constituting any permanent disability or impairment that is secondary to the injuries sustained in the accident.

14

*Brossett v. Howard*, 08-535 (La.App. 3 Cir.12/10/08), 998 So.2d 916, *writ denied*, 09-77 (La. 3/6/09), 3 So.3d 492; *see also Matos v. Clarendon Nat'l Ins. Co.*, 00-2814 (La.App. 1 Cir. 2/15/02), 808 So.2d 841. As we set forth above, since the jury verdict specifically listed disability as a category for damages, we must assume the jury did not include any award for disability in the $75,000.00 award made for physical pain and suffering. Thus, no amount of damages was awarded for disability. We find this failure was an abuse of the jury's discretion.

The evidence established Ms. Guidry suffered impairment as a result of her injuries. Dr. Blanda testified Ms. Guidry sustained a 25% to 30% total body impairment as a result of the 2004 accident, but believed she was "functioning very well" following surgery. He also testified he intended to discharge Ms. Guidry from his care until the 2007 accident occurred. He believed she could have returned to her job at Melancon Funeral Home but for the 2007 accident.

Following the 2007 accident, Dr. Blanda determined Ms. Guidry suffered from a 45% total body impairment and has restricted Ms. Guidry to sedentary to "very light" activities. Dr. Hodges permanently and totally disabled Ms. Guidry from all employment and restricted her to nothing more than light recreational activities.

Although Dr. Bertuccini only listed Ms. Guidry as having a 5% total body impairment, he agreed she would likely suffer from "chronic cervical and lumbar pain and may have ongoing arm pain and leg pain *along with disability*." He agreed that Ms. Guidry suffered from a "partial disability" and "her severe pain limits her from certain activities."

When a jury's award of damages is excessively low, even when the jury awards no damages for a particular item, an appellate court can only increase the award "to the lowest amount which is reasonably within the court's discretion." *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219. The

jury's failure to award any disability damages in this case was clear error. After reviewing prior awards in similar cases, and the evidence presented at trial, we conclude the lowest amount the jury could have awarded to Ms. Guidry for her disability is $40,000.00. Accordingly, we amend the judgment to reflect this increased award.

*3. Mental Anguish*

Ms. Guidry argues "despite uncontradicted evidence that [she] suffered mental/emotional damage as a result of the accident," the jury abused its discretion in awarding nothing for same. She asks this court to award $50,000.00 for mental anguish.

In this case, since the jury verdict provided a separate category for "physical" pain and suffering, the jury must have concluded Ms. Guidry suffered no depression or other mental or psychological dysfunction as a result of the 2007 accident.

Ms. Guidry testified at trial that she had recovered from her 2004 accident and resulting back surgery, and was having no psychological or emotional problems at the time the 2007 accident occurred. She testified the 2007 accident was a very traumatic experience, and she became upset and depressed over the severe pain she began experiencing following the accident. Ms. Guidry stated she became even more despondent when the epidural steroid injections did not provide any lasting relief from her pain. She also testified she felt "unworthy" about her inability to do the things she had always done around the house. She also stated she became unable to drive due to fear caused from the accident and needed her daughter to drive her everywhere.

Defendants argue the jury was well within its discretion in not making an award for mental anguish. They specifically note that Ms. Guidry underwent counseling for a period of time following the 2004 accident, but has not had any

16

counseling for emotional issues since the 2007 accident. They argue this more than justifies the jury's decision not to award Ms. Guidry anything for mental anguish.

Dr. Hodges testified that Ms. Guidry had complained of nervousness and depression, and believed counseling could benefit her in "dealing with depression and anxiety due to secondary pain complaints." We also note Adam Guilbeau, a witness to the accident in question, rendered assistance to Ms. Guidry before emergency personnel arrived at the scene. He testified he approached Ms. Guidry and "was asking her if she wanted an ambulance, and I couldn't really understand her, she was really shaking bad, and couldn't talk really."

The jury was simply unreasonable and abused its discretion in failing to award Ms. Guidry any amount for mental anguish. We find the lowest amount the jury could have awarded to Ms. Guidry for her mental anguish is $30,000.00.

4.    *Loss of Enjoyment of Life*

Ms. Guidry argues the jury abused its discretion in only awarding $10,000.00 for loss of enjoyment of life. Loss of enjoyment of life "refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." *McGee v. AC & S*, 05-1036, p. 5 (La.7/10/06), 933 So.2d 770, 775. Unlike pain and suffering, "whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury." *Id.*

The medical testimony from all the physicians in this case concluded Ms. Guidry would endure chronic neck and back pain, and would face a lifetime of pain management. Ms. Guidry was restricted by both Dr. Blanda and Dr. Hodges to nothing more than light recreational activities. Dr. Bertuccini also noted that Ms. Guidry's "severe pain limits her from certain activities." However, the jury

heard testimony from Ms. Guidry that by October 2008 she was "feeling better" and was able to begin Cajun dancing again. While Ms. Guidry's pain is ongoing and while the award is seemingly on the low side, we are unable to say the award was abusively low, given the jury's vast discretion. Therefore, we will not disturb the jury's $10,000.00 award for loss of enjoyment of life.

## DECREE

For the foregoing reasons, the jury's award of $10,000.00 in future medical expenses is amended, and plaintiff-appellant, Eunice Guidry is awarded $72,056.00 for future medical expenses. The judgment is also amended to award Eunice Guidry $40,000.00 for past, present, and future disability and $30,000.00 for past, present, and future mental anguish. All other aspects of the jury's damage awards are affirmed. Costs of this appeal are assessed equally to the parties.

**AFFIRMED, AS AMENDED.**

18