STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-82


WALTER KUPKE

VERSUS

SHELTER INSURANCE COMPANY, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2013-0833
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Sylvia R. Cooks, Phyllis M. Keaty, and Van H. Kyzar, Judges.


AFFIRMED.

David D. Benoit
Justin R. Cantu
Post Office Box 877
Breaux Bridge, Louisiana 70517
(337) 332-6666
Counsel for Plaintiff/Appellant:
        Walter Kupke

Thomas R. Hightower, Jr.
Wade Kee
Thomas R. Hightower, III
Law Offices of Thomas R. Hightower, Jr.
Post Office Drawer 51288
Lafayette, Louisiana 70505
(337) 233-0555
Counsel for Defendant/Appellee:
        Shelter Mutual Insurance Company

**KEATY, Judge.**

Following a jury trial, Plaintiff, Walter Kupke, was awarded $79,455.80 in damages arising from an automobile accident, and the trial court signed a judgment awarding that amount plus legal interest and costs. Plaintiff now appeals the trial court's judgment. For the following reasons, we affirm the judgment.

## FACTS & PROCEDURAL HISTORY

On November 30, 2012, Walter Kupke was in an automobile accident wherein he was rear-ended by a truck owned by Rader's Insulation Express, LLC, and operated by Jorge Silva. Following the initial impact, Kupke's vehicle was pushed into an intersection where it was struck by another vehicle. As a result, he sustained bodily injuries to his neck, back, shoulders, knee, and hand. Kupke filed suit against Silva, Rader's Insulation, and its insurer, Shelter Mutual Insurance Company (Shelter). He also filed suit against his uninsured/underinsured carrier, USAA Casualty Insurance Company. Thereafter, Rader's Insulation and Shelter stipulated to liability pursuant to a Stipulation and Consent Judgment. All Defendants were dismissed prior to trial except for Shelter.

The matter proceeded to a jury trial which was held June 26-28, 2017, after which Kupke was awarded $79,455.80 in damages as follows: $5,000.00 for past physical pain and suffering; $12,500.00 for future physical pain and suffering; $10,000.00 for past mental anguish; $10,000.00 for future mental anguish; $0.00 for loss of enjoyment of life; $16,955.80 for past medical expenses; and $25,000.00 for future medical expenses. On July 7, 2017, the trial court signed a judgment awarding that amount plus legal interest and costs. Kupke subsequently filed a Motion for Judgment Notwithstanding the Verdict, or In the Alternative Motion for Additur or Motion for New Trial, which the trial court denied following

a hearing. Its written judgment was issued on September 15, 2017. Kupke thereafter appealed the July 7, 2017 judgment.

On appeal, Kupke contends that the jury erred in failing to award him damages commensurate with the evidence adduced at trial.

## STANDARD OF REVIEW

"It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages." *Guillory v. Lee*, 09-75, p. 14 (La. 6/2/09), 16 So.3d 1104, 1116; *see also* La.Civ.Code art. 2324.1. General damages are speculative in nature and incapable of being fixed with mathematical certainty. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31. "They include pain and suffering, physical impairment and disability, and loss of enjoyment of life." *Id*. at 1130. Although loss of enjoyment of life is a component of general damages, it is "conceptually distinct from other components of general damages, including pain and suffering." *McGee v. A C & S, Inc*., 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775. In the regard:

> Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.

*Id*. On review of an award for general damages, an appellate court cannot decide what it considers to be an appropriate award. *Guillory*, 16 So.3d 1104. Rather, the appellate court reviews the trial court's exercise of its discretion. *Id*. An award of general damages "is reviewed pursuant to the abuse of discretion standard." *Thibeaux*, 883 So.2d at 1131. The plaintiff bears the burden of proving entitlement

to general damages by a preponderance of the evidence. *Schwartzberg v. Guillory*, 16-753 (La.App. 1 Cir. 2/17/17), 213 So.3d 1266.

On the other hand, special damages "may be determined with some degree of certainty and include past and future lost wages and past and future medical expenses." *Thibeaux*, 883 So.2d at 1130. A special damages' award is reviewed pursuant to the manifest error standard of review wherein an appellate court considers: 1) whether a reasonable basis exists for a trial court's conclusions and 2) whether that finding was clearly wrong. *Thibeaux*, 883 So.2d 1128; *Guillory*, 16 So.3d 1104. "The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence." *Thibeaux*, 883 So.2d at 1131.

## DISCUSSION

In his assignment of error, Kupke contends that the jury erred in failing to award him damages commensurate with the evidence adduced at trial. He alleges that the accident caused him to sustain a minor traumatic brain injury (TBI), hearing loss, vertigo, anxiety, and depression, which will permanently impact his professional, social, physical, and mental wellbeing. Kupke opines that the jury's award is abusively low and merits an increase. According to Kupke, an award ranging from $20,000.00 to $45,000.00 would compensate him for the ten-month treatment of his headaches and the pain in his neck and left leg. He opines that $90,000.00 would compensate him for his hearing loss and vertigo. He concludes that the jury should have awarded him most, if not all, of the life care plan totaling $209,656.00.

In opposition, Shelter contends that Kupke's evidence presented at trial lacked testimony regarding treatment rendered for his alleged mild TBI complaints, or any substantive treatment for any of his other alleged injuries other than the emergency room visit on the date of the accident. Shelter argues that there was,

3

however, significant testimony and medical records regarding Kupke's prior brain injuries and/or conditions that manifested before the accident. Shelter opines that Kupke, who worked at a nuclear power plant after the subject accident and has maintained steady employment, failed to present evidence of lost wages.

In this case, the jury awarded Kupke general damages and special damages. We must review the evidence in the record to determine whether the jury's awards were contrary to the evidence or constitute an abuse of discretion.

Kupke's trial testimony reveals that he underwent a CT scan in 2002 for "stress related things." According to his testimony, Kupke was involved in an automobile accident in 2005 wherein he ran into a ditch. Although Kupke could not remember any details, he assumed that he was driving home, fell asleep at the wheel, woke up the following morning, and thereafter walked home. As for the automobile accident at issue, Kupke recalled being "in the middle of the intersection with the truck up against my side of my door." He was transported to the hospital where his son picked him up and "[p]robably" took him home although Kupke did not "remember much of anything for the next couple of weeks." According to medical records from Acadian Ambulance Service and Lafayette General Medical Center (LGMC) dated November 30, 2012, Kupke denied neck and back pain, complained of a headache and left shoulder pain, and was diagnosed with a neck and back sprain.

Kupke's testimony reveals that, following the subject accident, he presented to Dr. Ronald Woods, a family medicine physician in Monroe, for shoulder pain. Kupke testified that he no longer suffers from shoulder pain. Kupke advised that he presented to Dr. Lawrence Danna, an ear, nose, and throat physician, for hearing loss and balance issues. Kupke stated that he had good balance prior to the accident, although it "disappeared after the wreck." He is currently employed by

4

CP&I as a quality assurance manager. Before the accident, he rode his motorcycle, played music with his friends, and played golf. Following the accident, he no longer rides his motorcycle because balance issues have made him "scared." Following the accident, his memory is "[n]ot real good," and he repeats himself. Kupke noted that post-accident, he spends time with his wife and together they watch movies.

On cross-examination, Kupke revealed that the amount of time he spent playing in a band decreased prior to the accident at issue. He opined that if he wanted to play golf, he could do so without difficulty. Kupke admitted to riding his motorcycle on several occasions following the accident. He has been steadily employed post-accident and has not received complaints regarding his job performance. Kupke noted that post-accident, his salary has increased, and he has performed work at a nuclear plant in South Carolina. Kupke advised that he works daily and on some weekends. He revealed that his busy work schedule leaves him with little time to do other things on weekends. He noted that he is able to care for himself without physical limitations. Although Kupke sustained a concussion in the accident at issue, he did not think he was knocked out or lost consciousness, and he failed to seek treatment for the same.

Kupke discussed his pre-accident medical history on cross-examination. He advised that in the early 2000s, he suffered from anxiety and was prescribed Valium and benzodiazepines. According to his testimony, anxiety caused him to quit his job at Turner Industries. Kupke agreed that he complained of dizziness and memory loss on August 8, 2002 and underwent a CT scan. This is confirmed by medical records submitted into evidence which reveal that the CT results were normal. Kupke testified that he lost consciousness following his automobile accident in 2005. When asked whether the "amnesia . . . that was occurring in

5

2005 still exists today," Kupke answered, "[y]es." His testimony indicates that medical records from 2011 note that he was suffering from back pain which was being controlled with medication. The following trial colloquy took place after Kupke recalled presenting to Dr. Jamie Cordova, his general physician, on November 13, 2012:

> Q     The issues being that you were having -- losing sight in both eyes and your face was numb, correct?
>
> A     I remember the face. I don't remember the eyes.
>
> Q     Dr. Cordova . . . indicated that he recommended that you go see a neurologist two weeks before the accident we're here for today. Did you go see a neurologist before this accident?
>
> A     I don't -- I don't recall.

Although Kupke could not remember telling his ear, nose, and throat physician, Dr. Danna, that he suffered from a muffled right ear prior to the accident at issue, he could not "deny" Dr. Danna's contrary testimony.

On further cross-examination, Defendant's counsel noted that Kupke provided Dr. Shelly Savant, a certified life care planner and expert witness for Kupke, with an incomplete medical history. Defendant's counsel explained that while Kupke informed Dr. Savant of a tonsillectomy in 1965, elbow fracture in 1973, foot fracture in 1978, and a right-hand fracture in 1991, he failed to provide information regarding the dizziness and memory loss issues he experienced in 2002, his automobile accident in 2005, and his November 13 appointment with Dr. Cordova two weeks before the instant accident. When questioned about this discrepancy, Kupke explained that he "did not remember." When asked whether Dr. Savant's failure to have all of Kupke's pertinent medical history would handicap her assessment, he responded: "I suppose so." Kupke presented to Dr. Cordova, his general physician, approximately six months after the accident at

issue with no complaints. Kupke recalled telling Dr. Woods, the family medicine physician, that he was ready to settle the matter in 2014.

On re-direct examination, Kupke recalled an incident in 2011 wherein he slipped and fell off the side of a bulkhead to a barge. As he was climbing back up, he sliced his leg which became infected. He could not recall hurting his back as a result of the slip and fall. However, Pinnacle Home Health nursing visit records dated July 16-17, 2011, which were submitted into evidence and in the record on review, reveal that Kupke was experiencing back pain.

Kupke's wife, Dana Kupke, testified that she met Kupke on September 11, 2012. Before the accident, Kupke was "fun" and they rode his motorcycle, went to dinner, and watched movies. After the accident, they "had to make modifications" to accommodate Kupke's right-ear hearing loss. The modifications require Dana to walk to the left of him so "he can hear [her] talk." At night, Dana has to turn off the light switch because Kupke "lose[s] his balance" in the dark. Kupke "avoids social situations" because he gets uncomfortable and stutters. She agreed that Kupke has maintained employment. On cross-examination, Dana remembered that, when they were dating, Kupke revealed that he could "stand on one foot forever." Dana noted that Kupke experienced "mild[]" hearing problems prior to the accident. Dana testified that she and Kupke were married following the accident.

Thereafter, the videotaped depositions of Dr. Woods and Dr. Danna were played for the jury and submitted into evidence by Plaintiff's counsel. The record contains two pages of the transcript from Dr. Danna's deposition dated June 7, 2017. Therein, Dr. Danna admitted that Kupke "may have had muffling" in his right ear before the accident at issue. Dr. Danna revealed that he performed multiple audiological evaluations following the accident. The record contains an audiological evaluation dated December 20, 2012, wherein Kupke complained of

dizziness and that his right ear "fe[lt] muffled X 1 y[ea]r." On January 21, 2013, Kupke complained of dizziness and a muffled right ear. On January 28 and February 25, 2013, Kupke was no longer experiencing bouts of dizziness, although his right ear remained muffled. According to the audiological records, no significant changes were noted on July 21, 2014.

Kupke also saw Dr. Woods following the subject accident, complaining of shoulder pain. Dr. Woods' medical records reveal that Kupke answered a questionnaire on December 5, 2012, providing the following medical history: tonsillectomy in 1965; left elbow fracture in 1973; left foot fracture in 1978; nasal issues from a motor vehicle accident in 1981; right-hand fracture in 1991; and a right-leg issue in 2011. Dr. Woods' medical record dated December 11, 2012, reveals that Kupke underwent an MRI of his head arising from a "[motor vehicle accident] two weeks earlier with dizziness and short-term memory loss and headaches and lack of concentration with some nausea." The results of the MRI included mild sinusitis and mastoiditis with no other significant abnormalities. He presented to Dr. Woods on July 17, 2014, who noted that Kupke was not having headaches but was "experiencing vertigo from his injury on 11-30-12" and "hearing loss of right ear and saw Dr. Danna for this." Dr. Woods diagnosed Kupke with post-concussion syndrome and "some permanent damage to his brain[,]" recommended an appointment with Dr. Danna, and a possible follow-up MRI. A follow-up MRI was performed on July 22, 2014, and the results were unremarkable. Dr. Woods' medical record dated October 6, 2014, reveals that Kupke indicated he is "ready to settle."

Plaintiff's expert neuropsychologist, Dr. James Pinkston, Ph.D, testified that he performed an independent neuropsychological evaluation on Kupke in 2016. Dr. Pinkston opined that during the evaluation, Kupke did not exaggerate his

physical or psychological symptoms. According to Dr. Pinkston, Kupke's symptoms included poor mental processing speed, depression, and anxiety. He explained that a mild TBI is a term used when discussing the severity of a brain injury. Dr. Pinkston revealed that "a loss of consciousness is not required for a [TBI]. You have altered consciousness." Dr. Pinkston testified that although he remains slow and cannot multitask, Kupke has reached maximum medical improvement. Dr. Pinkston did note that Kupke had pre-existing anxiety; however, Kupke is less able to manage people or deal with stressors following the accident. Dr. Pinkston revealed that Kupke's "depression could be treated." He explained that Kupke remains on anti-anxiety medications that he was prescribed before the accident; however, he has stopped taking his antidepressant medication.

On cross-examination, Dr. Pinkston admitted that he was not Kupke's treating physician. According to Dr. Pinkston's testimony, he initially met with Kupke approximately three years following the accident. The only information available to him regarding Kupke's pre-existing medical history was based upon Kupke's subjective statements and "minimal medical records." Dr. Pinkston agreed that Kupke has been steadily working since the accident and that his salary has remained "about the same or more." Dr. Pinkston agreed that Kupke experienced dizziness and memory loss in 2002. Dr. Pinkston testified that Kupke's complaints of dizziness and memory loss were "significant enough . . . for [Kupke's physician] to order a CT."

On cross-examination regarding the 2005 automobile accident, Dr. Pinkston opined that Kupke experienced "a period of posttraumatic amnesia." He was unsure how long Kupke "was out" because "he drove himself home, so he had amnesia for that period of time but he wasn't unconscious the whole time." When Defendant's counsel advised that Kupke did not drive himself home because his

car was totaled, Dr. Pinkston responded, "Okay." Dr. Pinkston admitted that Kupke did not tell him about the 2005 accident despite informing him of an accident which occurred in 1981. He opined that knowledge of the 2005 accident could have been helpful when formulating an opinion.

During cross-examination, Dr. Pinkston explained that his initial report incorrectly noted that Kupke lost consciousness following the instant accident. Dr. Pinkston revealed that Kupke had been prescribed Valium for pre-existing anxiety. Dr. Pinkston explained: "At high doses benzodiazepines like Valium can cause some cognitive difficulties some of the time," although he opined it may not have been a problem for Kupke as he "continued to work productively." Dr. Pinkston did not anticipate Kupke's psychological functioning "getting worse."

Defendant's expert neuropsychologist, Dr. Staats, Ph.D., testified that he performed an independent medical evaluation of Kupke. Dr. Staats, who was unaware of Kupke's 2005 automobile accident, agreed that a loss of consciousness could cause long term problems. Dr. Staats was aware of Kupke's dizziness and memory loss issues in 2002 and his vision and facial numbness issues prior to the accident at issue. With respect to Kupke's vision and facial numbness, Dr. Staats opined that in addition to Bell's palsy, "the doctor at that time was concerned about a possible transient ischemic attack" (TIA), i.e., "a mini stroke." Dr. Staats agreed that Kupke may have been experiencing TIAs in conjunction with his memory loss and dizziness symptoms. He opined that Kupke's symptoms may have been a "manifestation of his anxiety and his depression because the anxiety and depression can produce postconcussive disorder symptoms." Dr. Staats revealed that "[a]nyone who has an anxiety problem can be plagued with decreased ability to function if the anxiety rises to a certain state."

Dr. Staats stated the following after being asked whether Kupke confirmed that "he did not have a loss of consciousness" after the instant accident:

> He felt confused, and he didn't think that he fully lost consciousness, but that he did have sketchy memory of what went on. And he described that sketchy memory as continuing for a couple of weeks. But, certainly, it would be prominent at the time of the accident. And that's all that's required as part of the criteria for the American Congress of Rehabilitation Medicine's definition for mild traumatic brain injury.

Dr. Staats opined that Kupke suffered a "[c]oncussion." Kupke was not suffering from complete amnesia for two weeks; he just suffered from a "spotty memory" which is a form of posttraumatic amnesia. The following colloquy thereafter occurred:

> Q    And if I would ask you to assume that -- or have you seen anything in any of the medical records of any of his providers that indicated any state of amnesia . . . that you reviewed post accident?
>
> A    No, I didn't notice that any of the doctors did that. They call it postconcussive disorder.

Dr. Staats performed tests on Kupke which indicated that he "has returned to normal." Although some of Kupke's scores did not return to high normal, they were all within the range considered normal, opined Dr. Staats. Dr. Staats noted that, notwithstanding Kupke's lower motor function score, his anxiety could have contributed to his failure to reach a high normal. Kupke's medication that he takes for his long-standing anxiety can cause "some decreased neuropsychological or memory functioning" and that "his continuing symptoms could be due to the things that he had pre-existing." He agreed that benzodiazepines can have negative, immediate, permanent, and long-term impact on neuropsychological functioning.

On cross-examination, Plaintiff's counsel asked: "You're not too, too worried, . . . about this 2005 incident as being the cause of the findings you found; is that true?" Dr. Staats responded that he was not "worried about it having

something active today[.]" When asked whether he agrees with Dr. Pinkston that Kupke is "not quite the same" following the instant accident, Dr. Staats responded: "I can't say that he's not the same, but I can tell you that he's back [to] average in all areas." Dr. Staats revealed that he and Dr. Pinkston use different techniques for determining premorbid IQ estimation. He noted that Dr. Pinkston "uses one that predicts IQ, and it's a good one. . . . [b]ut IQ is not total neuropsychological functioning." Dr. Staats explained that he, unlike Dr. Pinkston, employs "a methodology that combines both IQ pre-estimation and non-IQ neuropsychological information." When questioned again whether Kupke was the same man before the accident, Dr. Staats explained: "From his depiction, . . . no. From his wife's depiction on the questionnaires, he's pretty much back and in the range we would expect."

Plaintiff's expert witness, Dr. Savant, also testified at trial. Dr. Savant, a neurologist and psychiatrist, is a clinical assistant professor at Tulane University and also runs a private medical practice that involves the treatment of people with brain injuries. She is also a certified life care planner. According to Dr. Savant's medical records and testimony, she evaluated Kupke on March 6, 2015, for a life care planning consultation. According to her report, Dr. Savant obtained her information from Kupke and medical records from Acadian Ambulance Service; LGMC; Glenwood Family Practice & Occupational Health Center, i.e., Dr. Woods; and Dr. Danna. Kupke's prior injuries, as noted on her consultation, include: "On the Job Injury 1980's - fractured right hand/recovered 100%; M[otor] V[ehicle] C[ollision] 1980's - nasal trauma/recovered 100%; MVC 2005 - muscle soreness/no concussion; recovered 100%[.]" The report's relevant history section indicates that Kupke was in an automobile accident on November 30, 2012. The report notes that following the accident, Kupke "says he was disoriented for a brief

period and then subsequently developed headaches and shoulder pain. . . . [and] ongoing issues with dizziness, vertigo, falls, memory/attentional issues, and hearing loss." With respect to a concussion, Dr. Savant listed an onset of November 30, 2012 "[i]mmediate to MVC" and indicated that Kupke had "[n]o previous head injuries[.]" In her report, Dr. Savant revealed the following regarding Kupke:

> [F]orgets conversations; occasionally disoriented spatially; forgets things at work e.g. inspection documentation; difficulty with attention & concentration; no seizures/or recent headaches. Occasional dizziness - occasional vertigo/no n/v. Has lost his balance and almost fallen at work. Occasional blurry vision associated with dizziness; not necessarily associated with a headache; also some word-finding difficulties; slowed thought processes[.]

With respect to right-ear hearing loss, Dr. Savant noted an onset immediate to the accident at issue with "[n]o prior hearing issues or tinnitus[.]" She listed Kupke's relevant symptoms as follows: "[O]ccasional vertigo w/o nausea and vomiting; loss of balance[.]" According to her report, Kupke was treated with steroids; however, his symptoms did not resolve. After reviewing the medical records, interviewing Kupke, and performing a neuropsychiatric and physical examination, Dr. Savant's findings were that Kupke sustained a concussion, posttraumatic vestibular dysfunction, and cognitive disorder not otherwise specified. She further noted that Kupke had a history of hyperlipidemia and situational anxiety.

On cross-examination, Dr. Savant testified that she possessed Kupke's post-accident medical records but not his pre-accident medical records when preparing her report. Thus, Dr. Savant agreed that she had no information regarding Kupke's pre-existing memory loss, dizziness, and right ear problems. Dr. Savant was also unaware of Kupke's pre-accident complaints of vision loss and facial numbness. Dr. Savant opined, however, that Kupke "was forthcoming with me about three separate motor vehicle accidents that he had had prior, and described each injury in

13

each one, none of which were head injuries." Dr. Savant was unaware of Kupke's previous head injury sustained in the 2005 accident as shown in the following colloquy:

> Q     So his 2005 accident, . . . I assume he didn't . . . tell you like he did yesterday in court that he was knocked out all night, did not wake up until the next morning, and in fact still to this date has no recollection of the accident? You never had that information when you prepared your report, correct?
>
> A     I didn't have that information[.]

With respect to his minor TBI, Dr. Savant opined that it was possible that Kupke's condition could get worse with respect to "loss of structure and not working anymore." Conversely, Dr. Savant noted that Kupke "should not develop dementia[,] and he should not get worse in that regard." She testified that Kupke "had not had much treatment related to the after-effects of this accident."

Thereafter, Defendant's next witness to testify at trial was Michael Frenzel, a vocational rehabilitation counselor and life care planner. He reviewed Kupke's pre-accident and post-accident medical records. Mr. Frenzel's concern with Dr. Savant's methodology was that she did not have Kupke's pre-accident medical records. Mr. Frenzel explained that "[w]ithout having all the prior medical records," the marginal cost cannot be appropriately accounted for. Marginal costs are "defined as something related to and only to the accident in question." Access to pre-accident medical records is necessary when formulating a life care plan "[b]ecause you want to document what the history was and you want to look at the objective people that . . . did those tests or have seen that person prior to the accident, at the time of the accident, as well as after the accident." Mr. Frenzel presumed that a life care planner hired by a plaintiff should "have access to anybody . . . that you want to talk to" whereas "[o]n the defense side, . . . [he didn't] necessarily have that" choice because of HIPPA concerns. According to his

14

testimony, in addition to reviewing medical records, a life care planner should speak with the treating physicians. Based upon the evidence available to him, Mr. Frenzel did not have sufficient information from a methodology perspective to assign any number to Kupke's life care plan.

Thereafter, Dr. Cordova's videotaped deposition was played for the trial court and jury. The record before us contains Dr. Cordova's medical report dated November 13, 2012, wherein Kupke presented with complaints of "face being numb" and "sight lose [sic] in both [eyes] on Saturday – 11/10/12." Dr. Cordova opined that Kupke suffered from Bell's palsy with TIA.

According to our review of the above testimony and evidence in the record, Kupke was involved in an automobile accident in 1981 which resulted in nasal surgery. Kupke suffered from pre-existing back pain. In 2005, he was involved in an automobile accident where he was knocked unconscious and suffered amnesia. Two weeks before the accident at issue, Kupke presented to Dr. Cordova with complaints of facial numbness and loss of sight in both eyes. Dr. Cordova instructed Kupke to follow up with a neurologist, which he failed to do. According to Dr. Danna's testimony and medical records, Kupke's right ear was muffled both before and after the accident. Prior to the accident at issue, Kupke underwent a CT scan due to complaints of memory loss and dizziness. Those same complaints, i.e., memory loss and dizziness, were noted by Kupke following the instant accident. He never lost consciousness after the accident at issue. Despite his alleged injuries sustained in the instant accident, Kupke continued to work and his salary remained the same or increased. Testimony further provides that his work schedule remained the same or increased. Also, since the accident, he has gotten married.

Accordingly, the trial court did not abuse its discretion in its award of general damages. Additionally, it did not commit manifest error in awarding

special damages as a reasonable basis exists for the trial court's conclusion, and it was not clearly wrong. Thus, Kupke's assignment of error is without merit.

**DECREE**

The trial court's judgment confirming the jury's award in the amount of $79,455.80 plus legal interest and costs is affirmed. All costs associated with this appeal are assessed to Plaintiff, Walter Kupke.

**AFFIRMED.**