# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


## 18-712


CHAD LANGLINAIS AND WENDY LEJEUNE

VERSUS

DERRICK LEBLANC, ET AL.


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-3602, DIV. H
HONORABLE RONALD F. WARE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*


## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Jonathan W. Perry, Judges.


**REVERSED IN PART; AMENDED, IN PART;
AFFIRMED AS AMENDED; AND
REMANDED WITH INSTRUCTIONS.**

H. Alston Johnson, III
Phelps, Dunbar LLP
Post Office Box 4412
Baton Rouge, LA 70802-4412
(225) 346-0285
COUNSEL FOR DEFENDANTS-APPELLANTS:
    Derrick Leblanc
    Calcasieu Parish Police Jury

**Michael J. Williamson**
**Plauche, Smith & Nieset LLC**
**1123 Pithon Street**
**Lake Charles, LA 70601**
**(337) 436-0522**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
    **Derrick Leblanc**
    **Calcasieu Parish Police Jury**

**Robert I. Siegel**
**Gieger, LaBorde & Laperouse, L.L.C.**
**701 Poydras St., Ste. 4800**
**New Orleans, LA 70139-4800**
**(504) 561-0400**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Berkley Insurance Company**

**Barry A. Roach**
**Christopher S. Lacombe**
**Larry A. Roach, Inc.**
**2917 Ryan Street**
**Lake Charles, LA 70601**
**(337) 433-8504**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
    **Wendy Lejeune**
    **Chad Langlinais**

**John R. Shea**
**John Shea & Associates**
**1817 W. University Avenue**
**Lafayette, LA 70506**
**(337) 981-7432**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
    **Chad Langlinais**
    **Wendy Lejeune**

**Thomas M. Daigle**
**Attorney at Law**
**711 Johnston Street**
**Lafayette, LA 70501**
**(337) 234-4049**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
    **Chad Langlinais**
    **Wendy Lejeune**

**PICKETT, Judge.**

After the vehicle in which they were traveling was hit from behind, the two plaintiffs filed suit against the driver of the vehicle that hit them, his employer, and the employer's insurer to recover damages for the injuries they claimed to have suffered as a result of the accident. The matter was tried before a jury which awarded damages to one plaintiff but not the other. Each plaintiff filed a motion for judgment notwithstanding the verdict (JNOV) which the trial court granted. The defendants appealed. For the reasons discussed below, we affirm in part, reverse in part, and amend in part, the trial court's judgments granting the JNOV.

## FACTS

On June 15, 2015, Chad Langlinais and Wendy Lejeune, his girlfriend, were traveling together in Chad's truck in Lake Charles. Chad stopped his truck at a red light and waited to make a left turn. Derrick Leblanc was traveling behind Chad's truck in a van owned by the Calcasieu Parish Police Jury (CPPJ) and insured by Berkley Insurance Company. Derrick failed to stop the van and collided with the rear of Chad's truck.

Chad and Wendy filed suit against Derrick, CPPJ, and Berkley to recover damages for personal injuries they claim to have suffered in the accident (the accident). Chad asserted that his back and neck were injured in the accident, and Wendy asserted that her neck, back, and face were injured in the accident.

The matter was tried before a jury in October 2017. The parties stipulated that Leblanc was acting in the course and scope of his employment with CPPJ at the time of the accident, and his vault caused the accident. The extent of the damages Chad and Wendy suffered as a result of the accident was greatly contested because both of them had pre-existing neck injuries. Before and at the time of the accident, they were in a pain management program to address the pain

and other symptoms they suffered as a result of their prior neck injuries. They argue the impact of the van was severe and aggravated their pre-existing neck conditions, as well as caused new injuries. Chad testified that the accident occurred without warning when the CPPJ van "plowed" into his truck and that the repairs to his truck totaled $17,000.00. They introduced photographs of both vehicles and Wendy's face to establish the severity of the collision. The defendants established that both Chad and Wendy had serious credibility issues.

On October 13, 2017, the jury rendered its verdicts on Chad's and Wendy's claims. The jury awarded Chad damages for past medical expenses in the amount of $125,000.00, past loss of earnings and earning capacity in the amount of $100,000.00, and past pain and suffering in the amount of $5,000.00, but denied his remaining claims for damages. The jury did not award Wendy any damages for her claims. The trial court signed judgments in conformity with the jury's verdicts.

Chad and Wendy each filed a motion for JNOV or, in the alternative, motion for new trial. After a hearing on the motions, the trial court granted the motions for JNOV as requested. It increased Chad's damage awards and awarded Wendy damages. The defendants appealed and now assign two errors with the trial court's actions.

ASSIGNMENTS OF ERROR

1. The trial judge erred in granting the plaintiffs' motions for [JNOV] as to the damage awards, replacing the jury's considered and unanimous verdict with his own view of appropriate damages; or in the alternative, if the judgment[s] NOV [were] properly granted, the awards of damages in [them] are an abuse of discretion.

2. The trial judge erred in failing to order reversionary trusts as required by La. R.S. 13:5106(B)(3)(a) to be created for the awards of future medical expenses which he made in the judgments NOV, to be disbursed only in accordance with that statutory provision; and he erred in adding judicial interest to awards of future medical expenses which he made in the judgments NOV.

## JUDGMENT NOTWITHSTANDING THE VERDICT

A JNOV allows the trial court to modify the jury's findings to correct a jury's verdict as to liability or damages. La.Code Civ.P. art. 1811. Our supreme court outlined the criteria for granting such relief in *Joseph v. Broussard Rice Mill, Inc.*, 00-628, pp. 4-5 (La. 10/30/00), 772 So.2d 94, 99 (citations omitted):

> The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

Appellate courts apply the same standard to determine whether the trial court properly granted the JNOV. *Pitts v. La Med. Mut. Ins. Co.*, 16-1232 (La. 3/15/17), 218 So.3d 58. If a trial court properly grants a JNOV, it becomes the trier of fact and makes "an independent assessment of the damages and award[s] a proper amount of compensation under the facts of the particular case." *Anderson v. New Orleans Pub. Servs., Inc.*, 583 So.2d 829, 834 (La. 1991). On appeal, the trial court's damage awards are reviewed under the abuse of discretion standard. *Id.* Pursuant to the abuse of discretion standard of review, the appellate court considers the damage awards in light of the facts and circumstances of the particular case before the court. *Miller v. LAMMICO*, 07-1352 (La. 1/16/08), 973 So.2d 693. Consideration of prior damage awards is appropriate only if the review of facts shows an abuse of discretion by the fact finder. *Id*.

## DISCUSSION

Chad argued in his motion for JNOV that all but one of the jury's damage awards were "abusively low and reasonable persons could not arrive at a similar

3

verdict" and that the jury's award for his past pain and suffering was inconsistent with the jury's other damage awards. Wendy argued that the jury's refusal to award her damages was unreasonable in light of the medical evidence she presented at trial. The defendants opposed both motions. They argued that based on Chad's and Wendy's histories of untruthfulness, the jury validly determined that their claims for aggravation of their pre-existing neck injuries were not proven. The trial court agreed with Chad's and Wendy's claims and granted their motions for JNOV.

### *Chad Langlinais*

The trial court granted Chad's JNOV finding that the jury's damage awards were inconsistent and irreconcilable with each other. After granting Chad's motion for JNOV, the trial court increased the jury's damage awards as follows:

| | |
|---|---|
| Past Medical Expenses | $ 133,198.00 |
| Future Medical Expenses | 393,709.00 |
| Past Loss of Earnings | 100,000.00 |
| Future Loss of Earnings | 1,024,555.00 |
| Past Pain and Suffering | 75,000.00 |
| Future Pain and Suffering | 125,000.00 |
| Loss of Enjoyment of Life | 75,000.00 |
| Future Loss of Enjoyment of Life | 125,000.00 |
| Past Disability | 75,000.00 |
| Future Disability | 125,000.00 |
| Past Mental Anguish | 50,000.00 |
| Future Mental Anguish | 75.000.00 |
| | $2,376,462.00 |

Chad claims the accident exacerbated a pre-existing injury to his neck and injured his lower back and that both injuries require surgical intervention. He further argues that he can no longer work as a result of his injuries. The defendants argue that neither Chad's back nor his neck was injured in the accident. They

4

contend the trial court erred in granting Chad's motion for JNOV and in awarding him excessive damages.

At the time of the accident, Chad was forty-eight years of age. Throughout his adult life, he worked in industrial construction and operated heavy equipment, including operating jack hammers and cranes. Chad sustained a serious injury to his neck in 2013 when he was operating a jack hammer. Beginning in the fall of 2013, he continuously sought medical treatment for his neck. An MRI obtained in July 2013 showed multilevel degenerative disc disease of his cervical spine, moderate spinal canal narrowing at C6-7, and severe narrowing of the foramina and bone spurring that was most advanced at C6-7.

From that time until the accident, Chad had continuous treatment for his neck. On October 11, 2013, Chad saw Dr. Gregory Rubino, a neurosurgeon, who performed an extensive examination and rated Chad's functional impairment as "very severe." His examination showed that Chad had numbness and tingling in his entire left hand and that his pain was aggravated by turning his head left or right, extending his neck to look up or down, lifting overhead, or throwing, and lifting repetitive. Dr. Rubino reported that Chad had full strength and sensation in his upper extremities but atrophy of his left triceps. Dr. Rubino prescribed physical therapy, and Chad attended six physical therapy sessions in November and December 2013, during which his 10/10 neck pain[1] improved. At his last session, however, he reported that he was in too much pain to perform therapy.

On December 2, 2013, Chad began treatment with Dr. Sidney Crackower, a pain management physician. On December 30, 2013, Chad reported his 10/10 pain had decreased to 7/10. Thereafter, he reported his pain as 4/10 until June 22, 2015,

---

[1] Throughout this opinion, the pain ratings are based on a pain scale where 1/10 is the lowest pain rating and 10/10 is the highest pain rating.

one week after the accident. On that date, he reported his pain as 6/10. One month later, he reported his pain as 5/10. On that visit, Dr. Crackower noted that Chad had muscle spasms in his neck and back. He referred Chad to Dr. Roland Miller, an orthopedic surgeon, because Chad's neck and back pain increased when looking up and looking down. Dr. Miller ordered an MRI of Chad's neck and back. The July 2015 MRI of Chad's neck was essentially the same as the July 2013 MRI, but the MRI of his back showed a degenerative disc at L5-S1 with a small tear. Dr. Miller prescribed physical therapy which Chad attended for thirteen sessions. With therapy, his complaints steadily improved. He rated his pain as 5/10, 6/10, and 4/10 from September 23, 2015, through October 27, 2015. During that period, on October 14, he reported that the radicular symptoms in his left arm were better, and on October 20, he had no radicular symptoms in his left arm. Two days later, he reported that his headaches and the radicular symptoms in his left arm were better. At his last therapy session, on November 11, 2015, Chad complained that his low back pain was pretty severe and rated his pain 8/10. Nonetheless, he also reported that the pain between his shoulders and the radicular symptoms down his left arm had improved.

In February 2016, Chad sought treatment with Dr. George Williams, an orthopedic surgeon. He reported constant deep back pain that radiated into his right thigh that began after the June 2015 accident and also complained of neck pain that radiated down his left arm and possibly his right arm. He did not report his prior neck problems. Dr. Williams ordered an MRI of Chad's back, which showed that his back was essentially the same as shown on the 2015 MRI. A steroid injection and physical therapy did not relieve Chad's back pain, and Dr. Williams performed surgery on Chad's back in May 2016. Dr. Williams testified that more probably than not the back surgery was necessitated by the June 2016

6

accident. Dr. Williams also recommended that Chad no longer work as a crane operator due to the condition of his back and that he not lift more than 20 pounds.

Dr. Williams then recommended that Chad have neck surgery. A May 2016 cervical MRI did not show a new herniation but showed a disc protrusion and osteophyte compressing the spinal cord and nerves at C6-7 that did not exist on the July 2015 MRI. Dr. Williams opined that more probably than not the injuries Chad suffered in the accident necessitated the neck surgery. Dr. Williams did not know about Chad's prior neck problems until defense counsel had him review the 2013 MRI of Chad's neck during trial. After reviewing the MRI, he revised his opinion and testified that more probably than not the accident aggravated Chad's pre-existing neck condition. Dr. Williams acknowledged that Chad had a serious and longstanding pre-existing condition and testified that based on the 2013 MRI, Chad needed neck surgery before the accident. He testified that the neck surgery he recommended was needed to improve the quality of Chad's life and the function in his arms and neck.

On Dr. Williams' recommendation, Chad began treatment with Dr. Stephen Wyble, an anesthesiologist and pain management physician, in September 2016. As before, pain management and physical therapy relieved Chad's neck pain, and his pain subsided from 8/10. In January 2017, Chad reported his neck pain as 4/10 on three visits and 3/10 on one visit. At his last visit on August 28, 2017, Chad reported his pain as 5/10.

Dr. Lawrence Messina, an orthopedic surgeon, examined Chad on May 31, 2016. Dr. Messina compared the 2013 and 2016 MRIs of Chad's neck and found that the 2016 MRI evidenced changes consistent with degenerative disc disease. He testified that the degenerative changes in Chad's neck occurred over time, not acutely. Specifically, Dr. Messina pointed out that there were bony changes at the

end plates of Chad's cervical spine that take years to develop and narrowing of disc spaces which is common in people with degenerative disc disease. In his opinion, the fusion Dr. Williams recommended at the C6-7 level in Chad's neck more probably than not was related to its pre-accident condition, not the accident. Dr. Messina acknowledged that Chad had suffered a herniated lumbar disc in the accident but opined that back surgery was not appropriate because Chad had not had a steroid injection or participated in physical therapy. Chad, however, had both treatments with no relief before Dr. Williams recommended surgery.

The defendants highlighted many instances that they claim show Chad was dishonest. He intentionally denied having prior neck problems to potential employers and lied under oath during trial depositions. Additionally, he testified that he left Dr. Crackower's treatment because Dr. Crackower only gave him prescription drugs and was not doing anything to help him. Chad further testified that at the time of the accident, he had been having Dr. Crackowner's prescriptions filled but was not taking the medications. According to Chad, he weaned himself off opioids without Dr. Crackower's knowledge or assistance because he was afraid of becoming addicted. Yet, he did not explain why he had the prescriptions filled if he was not taking the medications or what he did with the unused medications. Dr. Crackower was upset to learn that Chad had violated his agreement for treatment. Additionally, Chad did not inform Dr. Williams or Dr. Wyble of his 2013 neck injury. Neither knew until they were testifying at trial how severe his pre-existing neck condition was before the accident or that he allegedly obtained medications for his neck pain but did not use them. Chad also made misrepresentations about the extent of his prior neck problems to his vocational rehabilitation expert.

Chad argues that he was entitled to a JNOV on the issue of damages because some of the jury's damage awards were inconsistent and irreconcilable with each other and, therefore, unreasonable under the evidence. The defendants contend that the jury's verdict shows the jury believed Chad's back was injured in the accident and required surgical repair but either did not believe his neck was injured in the accident, or if it was, the aggravation resolved before trial. We agree with the defendants. We also agree the medical evidence supports that decision.

Based on the medical evidence, including the conflicting medical opinions regarding the extent to which the accident aggravated Chad's neck condition and medical records showing the pain in his neck returned to its pre-accident level after the accident, the jury could have reasonably concluded that the accident aggravated Chad's pre-existing neck injury. It could have also concluded that the aggravation resolved prior to trial such that Chad had not proved he was entitled to recover all of the $133,198.00 past medical expenses he claims. Chad saw the same medical providers for both his back and neck and, except for his back surgery, the treatment he received for his back and neck was similar and rendered at the same time. As a result, it is unlikely the jury could have determined on its own exactly what costs applied solely to Chad's neck. The jury's award of $125,000.00 represents 94% of Chad's past medical expenses. This award is not unreasonable under the evidence, and we reverse the trial court's grant of JNOV as to this award.

We now consider the jury's single general damage award of $5,000.00 and find that the medical evidence shows it is inconsistent with its awards of all Chad's past lost earnings and the vast majority of his past medical expenses and is unreasonable in light of its conclusion that Chad's back was injured in the accident and required surgery. The jury found that Chad's herniated lumbar disc was caused by the accident but did not award him any future damages, although the

9

medical evidence established that his back injury would prevent him from returning to work as a crane operator, even if he had a successful neck surgery that alleviated his current limitations. For these reasons, the trial court did not err in granting the JNOV as to the remaining damage awards. *Minton v. GEICO Casualty Co.*, 16-592 (La.App. 3 Cir. 3/8/17), 215 So.3d 290, *writ denied*, 17-603 (La. 5/26/17), 221 So.3d 856; *Barras v. Progressive Sec. Ins. Co.,* 14-898 (La.App. 3 Cir. 2/11/15), 157 So.3d 1185, *writ denied*, 15-512 (La. 6/1/15), 171 So.3d 261.

After granting the JNOV, the trial court became the trier of fact and awarded damages after a de novo review of the evidence. We now review the damage awards to determine whether they constitute an abuse of discretion.

To recover past medical expenses, Chad had to present medical testimony to prove he suffered an injury in the accident at issue and that the injury was caused by the accident. *Reed v. LaCombe*, 15-120 (La.App. 3 Cir. 7/29/15), 172 So.3d 679. The trial court awarded Chad $393,709.00 in future medical expenses. To prove he is entitled to an award of future medical expenses, Chad had to show more probably than not that the expenses he seeks to recover were necessitated by the accident, what the expenses will probably cost, and that they would be incurred. *Guidry v. Allstate Ins. Co.,* 11-517 (La.App. 3 Cir. 12/21/11), 83 So.3d 91, *writ denied,* 12-225 (La. 3/30/12), 85 So.3d 121. A claim for future medical expenses must be established with some degree of certainty; however, it is recognized that such claims are somewhat speculative. *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996.

Dr. Williams testified that the neck surgery he recommended for Chad would cost approximately $120,000.00. He also prepared a plan for future medical treatment he believed Chad would need or would benefit him that totals

$273,709.00. Based on this evidence, we cannot say the trial court's award is excessive. *Guidry*, 83 So.3d 91.

The trial court awarded Chad $1,024,555.00 for future lost earnings. This award is based on the testimony of Theodore Deshotels, Chad's vocational rehabilitation expert, and Wesley Austin, his economist. Mr. Austin testified that the trial court's award represents the present value of Chad's future lost earnings claim. The defendants argue this amount is not substantiated by Mr. Deshotels' testimony.

Mr. Deshotels' testimony was based on Dr. Williams' testimony that Chad would no longer be able to work as a crane operator and would be limited to light work in the future. After considering Chad's lack of a high school diploma, his work history, and the results of testing he administered, Mr. Deshotels testified that Chad would only be able to earn an average of $18,000.00 per year as compared to his pre-accident annual earnings of $63,500.00.

Mr. Austin testified that he used this testimony to calculate three different values for Chad's future lost earnings claim. The first was based on a work-life expectancy of eleven years; the second was based on an eighteen-year work-life expectancy to age sixty-seven; and the third was based on a twenty-one year work-life expectancy to age seventy. The trial court awarded Chad $1,024,555.00 which is the amount Mr. Austin testified represents Chad's future lost earnings claim if he elects to begin receiving Social Security benefits at age sixty-seven.

We have reviewed Mr. Austin's testimony and Mr. Deshotels' testimony and agree that $1,024,555.00 is not substantiated by Mr. Deshotels's testimony. According to Mr. Deshotels' testimony, if Chad retires at age sixty-seven, his future lost earnings would be the total of his pre-injury earnings of $63,500.00 less his post-accident earnings of $18,000.00 multiplied by the number of years

11

between his age at the time of trial, forty-nine, and sixty-seven. Simplified, the equation is $45,500.00 x 18 which equals $819,000.00. The present day value of Chad's $819,000.00 future lost earnings must be determined by applying a discount rate, but Mr. Austin did not provide that calculation. Therefore, the trial court erred in awarding Chad $1,024,555.00 for future loss of earnings.

Mr. Austin did not identify the discount rate he used in his other calculations, and the calculation cannot be made based on the record. We have reviewed the evidence and find that Mr. Deshotels' and Mr. Austin's testimonies do substantiate an award of $678,686.00, which represents eleven years of his lost future earnings discounted to present value. Accordingly, we reduce Chad's award for future lost earnings to $678,686.00.

In *Bellard v. American Central Insurance Co.*, 07-1335, 07-1339, p. 29 (La. 4/18/08), 980 So.2d 654, 674, (citation omitted), our supreme court addressed general damages, explaining: "General damages . . . 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'" When assessing general damages for personal injuries, the duration of a plaintiff's symptoms and treatment are relevant factors to be considered. *Jones v. Progressive Sec. Ins. Co.*, 16-463 (La.App 3 Cir. 12/29/16), 209 So.3d 912.

The trier of fact has vast discretion in awarding general damages. Appellate courts do not amend general damages awards unless the record clearly reflects that the trial court abused its discretion. *Cox v. Moore*, 01-878 (La.App. 3 Cir. 12/12/01), 805 So.2d 277, *writ denied*, 02-724 (La. 5/31/02), 817 So.2d 94. The total general damage award should be considered to determine whether the trier of fact abused its discretion in making the awards. *Pitre v. Gov't Emp. Ins. Co.*, 596

12

So.2d 256 (La.App. 3 Cir.), *writ denied,* 600 So.2d 685 (La.1992). If an award is determined to be excessive, prior awards should be considered to determine the highest amount that is reasonably within the trier of fact's discretion. *Duncan v. Kansas City S. Ry. Co.*, 00-66 (La. 10/30/00), 773 So.2d 670.

The trial court awarded Chad past general damages totaling $275,000.00, which is represented by $75,000.00 each for past pain and suffering, past loss of enjoyment of life, and past disability, and $50,000.00 for past mental anguish. The trial court also awarded future general damages totaling $450,000.00 represented by $125,000.00 each for future pain and suffering, future loss of enjoyment of life, and future disability, and $75,000.00 for future mental anguish. The defendants contend these awards are excessive and should be reduced.

In reviewing these general damage awards, we consider a number of factors. First, the evidence shows the accident injured Chad's back, causing a disc herniation at L5-S1 and a torn disc that required that he undergo a transforaminal lumbar interbody fusion at L5-S1. According to Dr. Williams and Chad, this surgery was a success, and Chad's recovery went well. He did not require physical therapy and his only regimen during recovery was walking. Second, based on Chad's reports, the medical experts all agreed the accident aggravated Chad's pre-existing neck condition. Dr. Williams testified that Chad's pre-existing neck condition was severe enough to warrant surgery one and one-half years before the accident, and Chad underwent continuous medical treatment during that same time period. After the accident, Chad's medical records establish that by October 2015 his neck pain had returned to essentially the same level of pain he reported to Dr. Crackower in the five months preceding the accident. Thereafter, his neck pain did wax and wane as it had before the accident, but it improved to pre-accident levels when he received pain management treatment with Dr. Wyble, just as it had

13

before the accident. Additionally, Dr. Williams testified that (1) after surgical repair, Chad's neck pain would be resolved, and he would have full range of motion; and (2) if not for his back injury, Chad would be able to return to work as a crane operator. Third, Chad testified that before the accident, his life was "normal," but since the accident, he can no longer do many activities, like boating, skiing, fishing, and hunting, that he previously enjoyed. Fourth, Dr. Williams testified because his back injury required a fusion, Chad will likely have back issues in the future. Based on our review, we find that the trial court's awards of $275,000.00 for past general damages and $450,000.00 future general damages are excessive and an abuse of discretion. We now consider awards for similar claims.

In *Huntley v. 21st Century Premier Insurance Co.*, 16-514 (La. App. 3 Cir. 11/2/16), 204 So.3d 1085, *writ denied,* 17-148 (La. 3/13/17), 216 So.3d 803, this court affirmed an award of $150,000.00 for past and future pain and suffering, and $100,000.00 for past and future mental and emotional anguish to a plaintiff whose injuries required a cervical fusion and a lumbar laminectomy, discectomy, and fusion with instrumentation at L3-4. Additional awards of $25,000.00 each for past and future disability and past and future loss of enjoyment of life were not contested.

In *Young v. Marsh*, 49,496 (La.App. 2 Cir. 11/19/14), 153 So.3d 1245, the plaintiff suffered herniated discs in his neck and back. His neck injury required two anterior cervical fusions, one at C5-6 and another at C5, 6, and 7. His treating physician also recommended two additional surgeries for a disc herniation at L5-S1, but the plaintiff had not elected to have those surgeries before trial. The second circuit affirmed the jury's awards of $300,000.00 for the plaintiff's neck injury and $100,000.00 for his back injury.

14

Having considered the trial court's awards in light of Chad's injuries, his prior neck injury and associated medical treatment, his anticipated future medical treatment, and the impact his injuries and medical treatment have had and will likely have on him physically and mentally, we reduce the trial court's awards for past general damages to $100,000.00 and future general damage awards to $350,000.00.

*Wendy Lejeune*

Wendy contends the jury's failure to award her any damages for the aggravation of her pre-existing neck condition is unreasonable in light of the evidence. The defendants proved to the jury that Wendy has serious credibility issues, showing she had felony convictions for obtaining controlled dangerous substances by misrepresentation and fraud, driving while intoxicated, driving while under suspension, and theft; and that she had been fired for failing to account for insurance policy premiums she allegedly collected on her employer's behalf. With regard to the JNOV, they argue that because she lacks credibility, the jury could have reasonably concluded her injuries were so minor that they did not warrant an award of damages.

Wendy testified that during the accident, her face hit something in Chad's truck that caused a black eye, a lump on her face that lasted two months, and pain in her back and neck. She went to the emergency room after the accident, and the emergency room physician ordered CT scans of her face and neck. The CT report of Wendy's face documented a bruise measuring approximately 1.1 centimeters by 3.3 centimeters, which is approximately one-half inch by one and one-half inches, and swelling on her left cheek. There are no other records from that visit in the record. A black and white photograph of Wendy's face shows a small dark area on

15

her left cheek and two smaller dark spots, one on her nose and one below her left eye. The photograph does not clearly show bruises on her face or eye.

Wendy had suffered a neck injury in an automobile accident in 2004, which required a fusion at C5-6. Over time, the adjacent levels in her cervical spine degenerated, and she began having neck pain that increased over time. She also had other symptoms including shoulder pain, pain radiating down her arms, and numbness in her hands. In 2008, Wendy sought relief for her neck pain and other associated pain with pain management physicians in Texas. In July 2014, she went to Dr. John Budden, an orthopedist, on one occasion, seeking a referral to Dr. Crackower. At that time, she rated her pain as 7/10 on a scale of one to ten and complained of pain radiating from her neck to both hands and numbness in both of her hands, severe headaches, and muscle spasms in her neck. Dr. Budden reported that x-rays taken that date revealed degenerative changes of the discs above and below her fusion and straightening of her cervical spine. On physical examination, he noted muscle spasms to the right and left of the posterior cervical spine and a mildly positive Tinel sign over both flexor wrist creases. Wendy reported popping in her neck with active motion.

In July 2014, Wendy began seeing Dr. Crackower for treatment. He testified that on her first visit with him, Wendy complained of numbness in her hands but did not complain of it again. He also testified that she complained of pain radiating to both upper extremities throughout the time he treated her. Dr. Crackower's records show that after one month of treatment, Wendy's neck pain decreased from 7/10 to 5/10. After two months of treatment, her neck pain decreased again from 5/10 and, thereafter, vacillated between 3/10 and 4/10 until the accident, except for December 2014, when she reported on a pain form that she had 7/10 persistent pain in her shoulders and neck, down her left arm into her

fingers. She also reported numbness and described her pain as sharp, shooting, and stabbing. In July and August 2015 after the accident, Wendy rated her pain as 5/10. Dr. Crackower's records do not show that she reported the accident to him.

Wendy first consulted Dr. Miller on June 26, 2015, complaining of pain in her face, neck, back, and left shoulder. Based on her complaints, he ordered an MRI of her neck and lower back. Her cervical MRI showed a broad-based disc spur complex that was causing significant pressure at the C4-5 level, the level above her prior fusion; a narrowing of the spinal canal; and moderate to severe left neuroforaminal stenosis.[2] Her lumbar MRI was normal. At her next visit, Wendy reported that her neck pain had increased from 5/10 before the accident to 9/10 after the accident and that she could barely tolerate the pain even with pain medication.

Wendy next began treatment with Dr. Williams. Dr. Williams testified the July 2015 MRI showed that 95% of Wendy's pain was caused by a combination of the disc herniation and bone spur compressing her spinal cord at C4-5. He opined that the MRI clearly showed a bruise on Wendy's spinal cord at that level. He also testified that she had a disc protrusion at C6-7 that did not touch the spinal cord. Dr. Williams ordered another cervical MRI in June 2016. He testified this MRI showed that the bruise on Wendy's spinal cord had deteriorated to myelomalacia, a serious permanent condition, and that her cervical spine would continue to worsen without surgery. He related the degeneration of Wendy's spine after July 2015 and the need for surgery to the accident. Dr. Williams acknowledged that his opinion

---

[2] Foraminal stenosis is defined as "the narrowing of the cervical disc space caused by enlargement of a joint . . . in the spinal canal." https://www.spine-health.com/glossary/foraminal-stenosis.

as to causation was based on the history of Wendy's complaints that she reported to him and that he had not reviewed any of her prior medical records.

On cross-examination, Dr. Williams admitted that if Wendy had not been in the accident, it is possible her pre-existing neck condition could have degenerated to the condition evidenced on the May 2016 MRI. He further agreed that some of Wendy's pre-existing symptoms, such as numbness in her hands, radicular symptoms in her arms, as well as her neck pain and the overall condition of her cervical spine were also symptoms of myelomalacia. Dr. Williams explained, however, that if the myelomalacia he diagnosed was the result of degeneration, signs of cervical spondolitic myelopathy would have been present on the 2015 MRI, but none were.[3]

On July 13, 2017, Dr. Williams performed a three-level fusion at C4-7 to address the compression of Wendy's spinal cord and her related complaints. The surgery did not relieve all of her complaints and symptoms, and Dr. Williams testified that he needed to perform another surgery to address these issues.

On August 24, 2016, Dr. David Ferachi examined Wendy at the defendants' request. Dr. Ferachi testified that he did not see any damage to Wendy's spinal cord on her 2015 MRI. Based on Wendy's complaints, he concluded that the accident aggravated her pre-existing condition of cervical spondylosis. He disagreed with Dr. Williams' recommendation for a C4-7 anterior cervical discectomy and fusion because, in his opinion, her complaints did not correlate

---

[3] "Cervical spondylotic myelopathy . . . is myelopathy (spinal cord damage) caused by spondylosis (degeneration) in the cervical spine (neck)." Drs. Paul C. McCormick, Michael G. Kaiser, PeterD. Angevine, Alfred T. Ogden, Christopher E. Mandigo, and Patrick C. Reid, *Cervical Spondylotic Myelopathy,* (2019), https://www.columbiaspine.org/condition/ cervical-spond ylotic-myelopathy/.

18

with her radiographic findings.[4] He noted that Wendy had severe numbness into the palmar surfaces of her hands that was very generalized and testified that nothing in her cervical spine related to this complaint. Dr. Ferachi further explained that these symptoms could be caused by carpal tunnel syndrome, squeezing of the nerve around the wrist, or cubital tunnel syndrome, squeezing of the nerve around the elbow.

Dr. Ferachi acknowledged that injury at the C4-5 level can produce pain which starts in the neck and goes into the shoulder blade, but he qualified his agreement, explaining that based on her MRI, Wendy's complaints would have been unilateral, not diffused with hand numbing. Dr. Ferachi further testified that upon examination, Wendy had a bilateral positive inverted radial reflex sign and a bilateral positive Hoffman sign, which are signs of spinal cord injury or brain lesion. He differentiated the implication of these signs as to Wendy's situation, explaining that the inverted radial reflex sign does not usually correlate to C5 and that findings of both the positive Hoffman sign and inverted radial reflex sign can occur in 15-20% of individuals with normal imaging. Dr. Ferachi found mild spinal stenosis at C4-5, or narrowing of the space for the spinal cord, on Wendy's 2015 MRI but did not find any spinal cord injury. He denied that Wendy had myelomalacia of the spinal cord, stating that myelomalacia would indicate she had cervical myelopathy, which she did not have.

Dr. Ferachi did not review Wendy's June 2016 MRI. Wendy argues this invalidates his opinion as to causation. Dr. Ferachi and Dr. Williams both testified that the 2015 MRI did not show cervical myelopathy. Dr. Ferachi did not address the 2016 MRI. Therefore, no evidence contradicts Dr. Williams' opinion that

_____

[4] Dr. Ferachi agreed that the failure of Wendy's complaints to correlate to her imaging studies could be an indication that her complaints were made for secondary gain.

because the 2015 MRI did not show cervical myelopathy, the myelomalacia depicted on the 2016 MRI was caused by the accident, not degeneration. For these reasons, we find the jury's verdict is unreasonable under the evidence and affirm the trial court's grant of JNOV in Wendy's favor.

After granting the Wendy's motion for JNOV, the trial court awarded Wendy the following damages:

| | |
|---|---|
| Past medical expenses | $121,855.74 |
| Future medical expenses | 100,000.00 |
| Past mental & physical pain & suffering | 75,000.00 |
| Future mental & physical pain & suffering | 100,000.00 |
| Past loss of enjoyment of life | 20,000.00 |
| Future loss of enjoyment of life | 40,000.00 |
| Past disability | 20,000.00 |
| Future disability | 30,000.00 |
| | $506,855.74 |

Wendy's past medical expenses were documented as having been incurred. Dr. Williams testified that she needs an additional surgery and estimated its cost as $100,000.00. Accordingly, we find no error with the trial court's awards for past and future medical expenses.

The trial court awarded Wendy a total of $115,000.00 in past general damages and a total of $170,000.00 in future general damages. Again, we have reviewed these awards in light of Wendy's prior neck injury, the length of time she required active pain management for neck pain and associated complaints, the fact that she has had one surgery that increased her pain and faces another surgery, and the impact her injuries and medical treatment have had and will likely have on her physically and mentally, and we reduce the trial court's awards for past general

damages to $75,000.00 and future general damage awards to $120,000.00.

*Reversionary Trusts for Damages*

Personal injury awards for future medical expenses entered against political subdivisions are governed by the requirements of La.R.S.13:5106(B)(3)(a).[5] The defendants contend the trial court failed to satisfy these requirements when it improperly awarded future medical expenses to Chad and Wendy without ordering that the awards are not subject to judicial interest and must be placed into a reversionary trust pursuant to La.R.S.13:5106(B)(3)(a). *Fecke v. Bd. of Super. of La. State Univ*, 15-1806 (La. 9/23/16), 217 So.3d 237, *mod. on other grounds on reh's*, 15-1806, 15-807 (la. 10/10/16), 218 So.3d. 1. Neither Chad nor Wendy oppose this claim.

In *Fecke*, the plaintiff argued that La.R.S.13:5106(B)(3)(a) does not prevent the payment of judicial interest on future medical expenses as provided in La.R.S.13:5112, which provides for judicial interest. The supreme court concluded that judicial interest is not due on future medical expenses placed in reversionary trust. Accordingly, we reverse that portion of the trial court's judgment that awards judicial interest on Chad's and Wendy's awards for future medical expenses. Additionally, we remand this matter to the trial court for the creation of two reversionary trusts in accordance with La.R.S.13:5106(B)(3)(a) and order that Chad's and Wendy's future medical expenses be placed in the trusts.

## DISPOSITION

---

[5] Louisiana Revised Statute 13:5106(B)(3)(a) provides that the court shall order all medical care and related benefits incurred subsequent to judgment be paid pursuant to a reversionary trust established for the benefit of the claimant "[i]n any suit for personal injury against a political subdivision wherein the court, pursuant to judgment, determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment . . . ."

The trial court's judgment in favor of Chad Langlinais is reversed as to: (1) the grant of his motion for judgment notwithstanding the verdict with regard to his award for past medical expenses and (2) the award of judicial interest on his future medical expenses. The judgment is affirmed as to the trial court's grant of JNOV for the remaining damage awards; however, the trial court's awards for past and present general damages are amended as provided herein. The trial court's judgment in favor of Wendy Lejeune is reversed as to the award of judicial interest but affirmed as to the grant of her motion for judgment notwithstanding the verdict; however the trial court's awards for past and future general damages are amended as provided herein. Additionally, the matter is remanded to the trial court; the trial court is instructed to create two reversionary trusts as provided in La.R.S.13:5106(B)(3)(a) and to order that Chad's and Wendy's future medical expenses be placed in the trusts.

**REVERSED IN PART; AMENDED IN PART, AFFIRMED IN PART AS AMENDED, AND REMANDED WITH INSTRUCTIONS.**